Thank you, Your Honor, and may it please the Court, as Justice Gould said, my name is Susan Fulmer and I represent Choice Cash Advance, the appellant and defendant in the underlying case. I would like to introduce Louie Meyer, who is with me today. He is the owner of Choice Cash Advance. There are several issues before the Court today. One is whether the transaction was instituted by the insurance company, Brook, the assignor of DZ Bank. Whether those transactions were integrated transactions or separate agreements, that is one question. Whether DZ Bank adequately proved chain of title and whether manifest injustice occurred and a related issue as to what the duty of an attorney is who is arguing a nearly identical case in another court in front of an appellate court on the same issues. What duty do they have to inform the court that that's going on while the same issues are being debated in that court? I do want to update the Court on a couple of things. One is that if the Court has been looking at the related cases at all, the Bankruptcy Court on reconsideration reduced the judgment against the Meyers to $123,200. DZ Bank filed a subsequent motion for reconsideration, which was denied, has appealed that to the District Court, which was denied, and now has that on appeal to the Ninth Circuit. That is an interesting observation. The reason the Court made that ruling is because $123,200 is what DZ Bank could prove was the value of the collateral at the time of the third transfer. I won't go into the transfers, which are pretty complicated, but what that means is that less than two years from the time that Choice entered into the agreement with Brook, its collateral and assets were worth 6% of what the loan value was and what he purchased them for. The other thing to update the Court on is the McCraney case, which has been central to this issue. On remand, and I can get into the merits of the McCraney case or why it's not distinguishable in a minute, but on remand there was quite a bit of discovery, thousands of pages of documents, two summary judgment motions which were denied, a two-day trial. DZ Bank submitted 43 pages of proposed findings of fact and that was in November 2014. As of this date, the trial court has not ruled. The issues were the same. The two creditors issue took up a couple of pages in that 43 pages. The rest are the same issues that are at issue here. Choice is looking for the same thing that Mr. McCraney got, which is a jury trial. These issues were not appropriate for summary judgment as the 11th Circuit decided and Choice should have the same opportunity that the McCraneys had. So I just want to be candid and also make sure I'm not missing anything, but I think what you're appealing is a denial of a motion for reconsideration. Yes, that's true and I think there was manifest injustice here. I think the McCraney decision shows that. Justice O'Connor, in her opinion, said they have to prove chain of title. That hasn't occurred here and although the bankruptcy court addressed similar issues as to the guarantee, one thing that's different is that in the Choice case, there was no allonge ever. There's no allonge in the record. They submitted the note, but no allonge. And when the district court looked at the issue of separate versus integrated documents, it did it because of what D.C. Bank included in its reply. Choice never had a chance to And the problem is that the district court, when D.C. Bank addressed that issue saying, oh, these are separate agreements, included no authority. What the district court did is insert that authority, but inserted the wrong authority. There's plenty of Kansas law and, in fact, Washington law that says these should be looked at as complete agreements, integrated agreements, because they were entered into on the same day by the same parties and for the same purpose. The note itself says the purpose of this loan was to purchase the franchise. It references other agreements as additional terms on its face and it should be considered as an entire agreement. I guess you could have fashioned some document that would have locked that in if that really was the intent of the parties, to condition the performance of the franchise agreement to the monies that were borrowed under this note, but that was not done. I mean, you're asking us to infer and to draw all sorts of conclusions in the context of an appeal from a motion for reconsideration. Yeah, it's a bit of a stretch, isn't it? Actually, I don't think so, and I think that's because the integration clause precluded a couple of things, but it didn't preclude looking at the agreements as a whole. What it said was there is no oral agreement and there is nothing contrary to these loan documents. The question of loan documents is what D.C. Bank argued on reconsideration, and I believe that makes it certainly ambiguous. There's several different definitions of loan documents. Some include the franchise agreement, some don't. On remand, in the McCraney case, and I realize the Court doesn't have this information, I'd be happy to provide supplemental briefing, but on remand, the McCraney case discovered a document we had never seen, which is the financing statement between D.C. Bank and Brooke from 2004 and amended in 2006 that says that the collateral that D.C. Bank had in those agreements. That's information we didn't have at the time of that motion for reconsideration, and it certainly raises the question of what D.C. Bank had. There are other documents that indicate the same thing, but the integration clauses don't prohibit looking at the agreements as a whole. They just are confusing, which makes the entire thing ambiguous. If you look at the Barnhart v. McKinney case, which we cited, which was one of the cases that Tri-State relied on, if you look at the Barnhart v. McKinney case, what it says is, in that case, they had several agreements, and they looked at all of the agreements, and they said if the agreements themselves are contradictory, you can look to those documents and look to the intent of the parties to determine the contract. That makes it ambiguous, and that's longstanding Kansas law. That was a Kansas Supreme Court case. The important thing to note here is that this is sort of like buying a house, right? You sign a lot of different documents. There's a lot of different parties. You might sign something with the IRS, something with the lender, a lot of things with the lender, but your purpose is to buy the house. All of the things that you sign are provided by the closing company, the title company. You sign them because that's what you have to do, and you end up with the house and a loan. The purpose here was to buy the franchise. As I said, it's stated on the face of the note. The documents were required. They were all provided by Brooke. Every franchise has the documents. This was not something that was optional. In looking at whether the same parties were behind those documents, entered into those documents, first the SEC found that that was part of the fraud, that all of these entities that Brooke created, BAC, BCC, BCF, many of them, were part of the fraud, and that they were all the same entity. Was any evidence submitted to the district court, and I'm also not clear to what extent we could look at that on reconsideration, but any evidence that the bank was involved and a participant in the franchisor's fraud? Well, remember, there was little discovery that was done. DC Bank said, this is a simple breach of contract case. They said you don't need to do any discovery. This is all about them breaching the contract. We'll be done. We'll be out of here, out of your hair. In fact, the discovery that showed up later indicates that, contrary to what DC Bank was alleging, I believe the complaint here says by October 2008, they discovered that Brooke had defaulted on DC Bank's note. We now know that occurred in this note was incurred. What was in front of the court at the time was mostly about Brooke, not about DC Bank. We didn't know until much later because of no discovery. Was the answer to Judge Gould's question no? Well, I think, yeah, I think the answer is no. I don't think at that point anyone anticipated that DC Bank had known much earlier than when they disclosed in the complaint. Those two things are contradictory, and that's because DC Bank intended to limit discovery. So you paid down some of this obligation. There were four different extensions where the viability of the note was acknowledged. I guess you could have come to court right away, but what was going on there? There was a decision that was made that these were valid notes and you the bank. The bank was charitable to some extent, and then suddenly you decided to come to court. A little unclear why you didn't do it sooner. Well, because Choice was trying to keep its business afloat, or Choice and its successive entities. Remember that the bankruptcy court said that DC Bank consented to the first two transfers that were at issue. October 2008, and I believe it was sometime in 2009, everybody was scrambling. Everybody. Brooks stopped doing what they were supposed to do, and the insurance companies couldn't do business without that, and everybody had to scramble. But there were four loan forbearance agreements where your client acknowledged this debt to the bank, unless I'm misunderstanding the record. No, that's correct. I think that's what Judge Block is getting at. And my answer to that is that may make DC Bank a holder. It doesn't make them a holder in due course. There's a lot of things that need to be worked out about what happened in 2008 between DC Bank and Brooks. I'm just curious. Where did this million-some-odd dollars go to that Choice was able to borrow? What did Choice do with the money? Choice never got it. Brooks paid it to the, and also I should say that Choice submitted $200,000. They paid $200,000 down in addition to the $1.7 million note. Choice didn't get any of the money. Brooks controlled all of the funds, all of the transactions. Some of the money went to pay the franchisor that was selling it, who did that through Brooks. Choice didn't even... Right from the bank to Brooks? It never went through Choice at all? No. No, it did not. So there was some document that Choice signed to authorize the bank to pay this money to Brooks? At the date of closings, Choice thought it was buying the franchise from Brooks all along. On the date of closing, when the closing documents were signed, there was a notice of agreement to this company called Lindsley Insurance, a notice of sale, and they said, we'll sign it. And he said, who are these people? Well, they're the people who actually own the franchise. That's what happened. Brooks was doing a lot of things that were not appropriate, and I don't think there's any question about that. Brooks controlled all of the commissions that came in. They paid Choice's lease. They paid Choice's yellow pages, bills, that kind of thing. Well, there were victims here, but why should the bank be one of the victims? Well, the question here is whether there was a genuine issue of material fact to determine what the court did at this point. And what the court said is, without evidence before it, they're a holder in due course. These are separate agreements, and it didn't have enough information in front of it to do that. We needed discovery, and discovery has indeed proven that some of those things would not have come out the way the court ruled. Choice, D.C. Bank was defrauded too. They don't want to admit that because that would ruin their case. But this is not a simple breach of contract case, and it shouldn't have been dismissed. I'd like to reserve my remaining minute for rebuttal. Thank you, Your Honor. Good morning. Alex Darcy for D.C. Bank. A couple contextual facts that the court should be aware of. To recall that counsel number one for Choice withdrew after the motion for summary judgment, and then a new firm came in for the motion for this case for what it is, which is essentially second guessing what first counsel did. If you look at the affidavits that Mr. Myers submitted, both in conjunction with his own motion for summary judgment, and then in response to D.C. Bank's cross motion for summary judgment, the sole focus in those affidavits is whether D.C. Bank was required to give notice under the note before it could sue for the balance. There's no effort whatsoever made to develop any factual effort with respect to fraud, and that's the problem for Choice Insurance in this case. The second contextual fact, which Ms. Fulmer smoothed over, is the bankruptcy court trial. The trial that they want happened in the bankruptcy court. It was a three-day trial before Judge Overstreet. Mr. Probst appeared with the original loan file and all of the documents, including the case. A representative, Brook, who executed the allange testified in that case. The Myers amazingly waived privilege and had their estate counsel testify, who testified that he advised them very clearly not to transfer unencumbered assets to their personal trust because he thought that would be a fraudulent conveyance, but they waived privilege, and that testimony is in the case. The beneficiary of the trust testified essentially that Mr. Myers, who's here today, makes all the decisions for the trust. On that basis, D.C. Bank prevailed on its 523-A2A claim for actual fraud for non-dischargeability, and the judge limited that ruling to the assets in which D.C. Bank had a security interest. The total value of the assets that were actually transferred were $385,000. The court said because the balance of those assets were in an entity called Myers Insurance, they weren't an asset of the Myers. They were, in fact, an asset of a separate company, Myers Insurance, and it's that issue that's on appeal because Mr. Myers controlled that company 100 percent, and so it was our position that because he controlled the company 100 percent, that conveyance of that company's assets for no consideration constitute a fraudulent conveyance. It's a novel issue. It's an issue of first impression under Washington law. It appears to be an issue of first impression in the Ninth Circuit, and that's the companion appeal that's before this court. We filed our opening brief last week on that. Let me ask you maybe something that might be a realistic question. The bank was willing to accommodate the choice on a number of issues. It was able to collect a couple hundred thousand dollars, something like that. That's correct. Any possibility here that you folks can sit down before a mediator perhaps and come to a resolution here since the bank has expressed a willingness in the past to try to accommodate choice? Might it be right to do so now? I think so. Well, I think, just so we're clear, so I'll they've actually paid the $123,000, so that amount is paid. The only issue on the subsequent appeal is that difference between 385 and 123 is the 267, and I believe we did have an initial mediation in the Ninth Circuit on that issue, and I think Mr. Meyer's position is, without putting words in his mouth, it's like, I won. I'm going to stand on my rights. I don't want to pay the bank another dollar. I just wanted to explore that realistically. And you said you had a mediation. Do you mean with the Ninth Circuit mediator's office? Yes, yes. It was telethon. It was more of a preliminary feeling to see whether they thought they could go forward, and they told us... Screening. I'm sorry? Screening as to whether the parties want to mediate. Correct. That's correct, and DZ Bank is willing to mediate. You're all willing to do that. Absolutely. So that's the context that the Court should consider, because I think one of the issues here is, what's the end result? Because Choice didn't file a reply brief, we don't know what their reply is to our argument that the bankruptcy trial is collateral estoppel on this issue. What have you done with your judgment? Have you made any effort to try to collect it? Was a bond put up? They paid it. They paid the $123,000. They wrote a check, and the way the satisfaction is written is it acknowledges that this appeal, this second appeal, is pending. And so that's where we are. And there's some tangential litigation related to that. So the ultimate beneficiary of these insurance accounts is a Texas insurance company whose general counsel happened to represent all the DZ insureds in a separate litigation. So when they bought those accounts, it's our position that that company knew exactly what it was doing, that we had an interest in it. So there is some tangential litigation, but it's all related to this $267,000. So back to that last point. So because they didn't file a reply brief, we don't know what their position is on res judicata, because the same issue was fully litigated. We had argued to the bankruptcy court that the district court's decision in this case should preclude the bankruptcy court from having to litigate the issue of our status as a holder in due course and whether we were entitled to the loan. And the judge said no. So we put all that evidence in the bankruptcy court record. And she did find in her findings that we were a holder in due course, and they have not cross-appealed that finding. So I think the only slight issue from an appellate perspective could be whether the Myers, as personal guarantors, are in privity with their own business, Choice Insurance, which they 100% own, and I would argue that they are. So then the other issue in the briefs that's not clearly delineated is what is the standard of a review, because the issues that they're raising here are from the motion for reconsideration, and they're based on the introduction of new evidence as opposed to rehashing arguments, legal arguments that they previously made. The standard is abuse of discretion. If they were just rehashing case law, in other words, bringing to the- They argue manifest injustice. Is that a proper consideration on the motion for reconsideration? On appeal, only on abuse of discretion. I don't see how it could be manifest injustice in light of the fact that they had their trial and in light of- We would have to find it was an abuse of discretion, right, to not find manifest injustice. Correct. So a few notes with respect to the McCraney case. I think it's completely distinguishable. There was a trial. It's not a jury trial. It was a jury waiver. That case was tried in October. We're still waiting for the judge to rule. It's completely different from this case in the sense, in that case, the borrower never made payments under the circuit. I think it's called Home Federal Bank of Nebraska. Their documents demonstrate that because they didn't hold the original note, they don't claim to be a holder of the note. They recognize that they're subordinate to us, so their interest isn't at stake. They were not holders of the new course, clearly. Correct. They didn't take a security interest. They didn't hold the original. Their internal emails acknowledged that and they wrote off the balance of the note. So the only issue, the issue that the judge is contemplating, as I understand it, is whether he's going to consider all those documents as a single transaction. We're making the same argument in this case that we're making in that case, which is that the parties are different. I know it's kind of an acronym nightmare, this case, with a different- No, environmental cases are acronym nightmare. You're actually in the minor leagues, acronym-wise. But there was one mistake in the district court's motion for summary judgment, which he corrected in his decision on the motion for reconsideration, which is that Brooke Credit Corporation is the original lender on the note. Brooke Capital Corporation is the franchise or, and then Brooke Credit Corporation assigns the note to Brooke Credit Funding Corporation, which is DZ Bank's borrower. That was an inadvertent mistake. It's easy to understand how there could be some confusion. Right, right. But- When you said a minute ago that what we're arguing is that McCarty is distinguishable because it seems to me what you're arguing with is that the issue that was litigated in the district court at summary judgment is whether the bank had to give notice, and your team won on that issue. Right. And now what's on appeal is the denial of a motion for reconsideration. Correct. And it's all new arguments. That's it. Right. And it's all new facts. And the district court's point is all those facts- The district court didn't consider these arguments. Correct. And the reason they didn't consider them because he said they were new facts, but they were available to you at the time that the original motions were litigated. You didn't put them in, you waived them. Right. And then to the extent that they, there's an odd reference to this Pennsylvania case that ended up in federal court in Kansas. And it's even odder still because the appellants actually put in the 10th circuit opinion, reversing it in their excerpts of record, but then didn't cite to it. And that case was reversed by the 10th circuit and the bank was allowed to sue. The 10th circuit found in one of the notes that they didn't have standing because they didn't establish standing, but on the other note, they did have standing and they should 993, the district court entered judgment in favor of the bank on that case. So the issue is whether there was an abuse of discretion for the trial court to deny reconsideration. And your strongest argument, opposing counsel says, acknowledges that quite frankly, and said, yes, that's right. And it was an abuse of discretion because this really would be manifest injustice, she says. And she argues essentially that this would be manifest injustice because there's another similarly situated individual or individuals who essentially got a different result. I realize that I'm paraphrasing, but if you could just go back up to the 30,000 foot level, what's your strongest argument on that point, sir? Okay. So on McCraney, and I say this, the similarly situated individual is McCraney. Yes. Okay. Or I said McCarty, that was yesterday's case, sorry. So McCraney did not sign an acknowledgement, which Choice signed. In the acknowledgement, Choice waived all of their defenses. When you're calling acknowledgement, are these the four loan forbearance agreements? It actually predates the loan forbearance agreement and all. In the other case, were there any direct acknowledgements of a loan to the bank? In other cases, there were. Not in McCraney. And McCraney never paid on the note, never paid DZ Bank on the note. And McCraney always took the position that he was subject to those competing claims from the bank in Nebraska. Okay. McCraney's a bit of an odd character. He's also a tax protester. He doesn't believe he owes federal taxes. Okay, but sorry, I don't want to get you off track. Your strongest signed an acknowledgement. It's in the excerpts of record at 61 in the second appendix. And the acknowledgement says that they acknowledge the debt without condition, deduction for any counterclaim defense recruitment or set off. And then they do four forbearance agreements where they acknowledge their obligations to DZ Bank. And then they pay in that period. They make the forbearance payments that they're supposed to make for, I believe, into 2010. So we're talking more than two years they make those forbearance payments. So they ratify their obligations under the acknowledgement by making the payments. McCraney didn't do any of that. Opposing counsel started her argument by suggesting that there was some kind of a duty by bank to notify the court about these earlier cases. Well, first of all, with respect to the Kansas case, which is related to the Pennsylvania case, we weren't a party to it until she brought it up. They had no idea that the opinion existed. With respect to the McCraney case, because the facts are completely distinguishable, we didn't believe that we had an obligation to raise it to the court. And if you look in, I think, Mr. Meyer's affidavits in conjunction with, I believe, the motion for reconsideration, he himself admits to conferring with other borrowers about the status of the litigation. I mean, there was other litigation, for example, in Kansas in the federal court there. The number 160 is thrown around in the record, but I don't know if there were 160 suits or not. I can tell you from my own experience that probably half of the borrowers filed bankruptcy. A significant percentage settled before litigation. A significant percentage settled after the start of litigation. I believe, in total, maybe seven borrowers actually litigated. We prevailed in, I believe, five on summary judgment. And the only two cases that remain are this case and McCraney. So my time is up. So I'd ask that you affirm the district court as it did not abuse its discretion in denying motion for reconsideration. Thank you. Thank you very much, Mr. Darcy. Now, Ms. Fulmer. If I could have an extra little bit of time to discuss the tri-state issue that counsel raised with me right before court. He mentioned that we included the . . . We'll make your time three minutes, so . . . Thank you, Your Honor. . . . a shot. But let me ask you the question before you start that Judge Block raised. If the court were to defer submission for a couple of weeks to see if the parties wanted to use our services to mediate now, you know, I realize you rejected that earlier. No, we didn't, Your Honor. Okay. So is there any chance that if we took that step and deferred submission that there might be interest? And you don't really have to respond that there is. We wouldn't force a mediation, but if there's a possibility of it that would be considered, then we could give you that option. Mr. Meyer has been willing to do mediation. There have been two of these screening conferences. Both times, DZ Bank indicated they believed their legal position was so strong that their . . . For my part, I get pretty uncomfortable talking about that. Okay. I think the question was, are you interested if we defer? Mr. Meyer has stated his interest in the past. Okay. That's all we need to know. Yes. And I agree, Your Honor. I apologize for that. There are a couple of things that opposing counsel said that are incorrect, and I want to set that straight. First of all, the assets transferred, this new case that he's talking about, were assets that Meyer Insurance acquired after 2008. So I want to make it really clear that there's not an additional choice assets or collateral of $267,000. There are not. They were acquired post-transfer or post-Brooke collapse. So I just want to make that clear. The $123,000 is what it is, and it will never change. And it has been paid. The reason this case is not moved is that DZ Bank has filed two more lawsuits involving Mr. Meyer. It makes it difficult to settle when you're receiving a barrage of litigation from a major global bank. The tri-state issue, we did cite on page 12 of our brief, footnote 5, and also footnote 13 and 14 on page 21, that the tri-state case had gone up on appeal. It was back on remand. The issue on remand had nothing to do with the rescission issue, the separate agreements issue versus integrated agreements. That issue stands. One of the loans was not remanded. That issue stands regarding the rescission for fraud against Brooke. I want to make that clear, but it's stated in our brief. On remand, there was a judgment. The judgment was post-settlement. The party settled in tri-state truck. So Mr. Darcy thinks he has a gotcha there, but we knew about that. He apparently didn't. He may not have read the footnote, but the case is cited there. The McCraney case, the 11th Circuit never dealt with the issues that Mr. Darcy raises, forbearance, acknowledgement. If you read Justice O'Connor's very short four-page opinion, it says, look, you got to prove it. You got to prove it. You may be a holder even. You're talking that you have possession, and that's what we have with the acknowledgement and the forbearances. You may be a holder. You haven't proven holder in due course. Now, in that case, there were the two different banks, but that was only a separate issue, and I can provide the citation for Dizzie Bank's 43-page proposed findings of fact in which the Court will see the issues here are the same as the issues there. Okay. Your extended time is up, and so I think we'd like to thank Ms. Fulmer for her argument, and we thank Mr. Darcy, and not just Spokane and Boise have fine advocates, but also Chicago and Seattle, so we thank you for your help.
judges: Block, Gould, Christen